1  Lawrence A. Organ (SBN 175503)
   *larry@civilrightsca.com*
2  Navruz Avloni (SBN 279556)
   *navruz@civilrightsca.com*
3  CALIFORNIA CIVIL RIGHTS LAW GROUP
   332 San Anselmo Avenue
4  San Anselmo, California 94960
   Tel. (415) 453-4740
5  Fax (415) 785-7352
6
7  Attorneys for Plaintiff,
   DEWITT LAMBERT
8
                    **UNITED STATES DISTRICT COURT**
9
                  **NORTHERN DISTRICT OF CALIFORNIA**
10
11
12  DEWITT LAMBERT,                        )  Case No.: _____
                                           )  UNLIMITED JURISDICTION
13          Plaintiff,                      )
                                           )  **COMPLAINT FOR DAMAGES**
14  v.                                      )
                                           )  1.  **Racial Discrimination, Hostile Work**
15  TESLA, INC. dba TESLA MOTORS,          )      **Environment and Retaliation - 42 U.S.C. §**
    INC.; and DOES 1-10 inclusive,          )      **1981**
16                                          )  2.  **Declaratory Judgment – 28 U.S.C. §§ 2201-**
            Defendants.                     )      **2202**
17                                          )
                                           )
18                                          )  **JURY TRIAL DEMANDED**
                                           )
19                                          )
20
21
22
23
24
25
26
27
28

**INTRODUCTION**

1.      Like tens of thousands of other newcomers to the San Francisco Bay Area, DeWitt Lambert arrived with high hopes for a better future. In the minds of many, this region is among the most committed in the United States to equality and diversity.

2.      The corporations that call the Bay Area, and especially Silicon Valley, home purport to embrace this heritage. Tesla, Inc., like many Silicon Valley giants, often presents itself as leading the way into the future. In part because of this image, DeWitt Lambert looked forward beginning the next stage of his career as a Tesla employee.

3.      Rather than the egalitarian, diverse, and modern workplace Mr. Lambert expected, he instead confronted a world seemingly unchanged by the Civil Rights Movement. Tesla employees, with the knowledge of Tesla's management and Human Resources Department, denigrated and physically assaulted Mr. Lambert—or, as they routinely called him, "this nigger."

4.      Mr. Lambert repeatedly sought the help of other employees, managers, and the Human Resources department at Tesla. Rather than corrective action, Mr. Lambert found tacit support for harassment he endured. Each time Mr. Lambert objected, he was ignored or punished while his harassers' behavior was rewarded.

**PARTIES**

5.      Plaintiff DeWitt Lambert ("Mr. Lambert") is a 44-year-old African-American man. He has been employed by Tesla, Inc., as a Production Associate since approximately June 26, 2015. Plaintiff is, and at all times relevant herein was, a resident of Oakland, California.

6.      Defendant Tesla, Inc., ("Tesla") is a publicly-traded Delaware corporation with its principal place of business in Palo Alto, California. In approximately February 2017, Tesla Motors, Inc., changed its name to Tesla, Inc. Tesla designs, manufactures, and sells electric vehicles, and operates its vehicle manufacturing factory at 45500 Fremont Blvd., Fremont, California ("the Fremont factory"). The harassing conduct at issue in this case took place at the Fremont factory.

7.      In addition to the Defendant named above, Plaintiff sues fictitious defendants Does 1-10, inclusive, because their names, capacities, status, or facts showing them to be liable are not presently known. Plaintiff is informed and believes, and thereon alleges, that each of the fictitiously named

1   Defendants is responsible in some manner for the occurrences herein alleged, and such Defendants
2   caused Plaintiff's damages as herein alleged. Plaintiff will amend this complaint to show their true
3   names and capacities, together with appropriate charging language, when such information has been
4   ascertained.

5         8.     Plaintiff is informed and believes, and thereupon alleges, that at all times herein
6   mentioned each of the Defendants was acting as the partner, agent, servant, and employee of each of the
7   remaining Defendants, and in doing the things alleged herein was acting within the course and scope of
8   such agency and with knowledge of the remaining Defendants.

9   **JURISDICTION AND VENUE**

10         9.     This action is based on Plaintiff's claim of employment discrimination, and in particular
11   discrimination against Plaintiff on the basis of race and/or color in his right to make, enforce, and
12   perform contracts, against Defendants, which arises under the Civil Rights Act of 1866 (42 U.S.C. §
13   1981). This court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28
14   U.S.C. § 1343(a)(4). Although Plaintiff has initiated parallel litigation, stating different claims, in State
15   court, Plaintiff has the right to bring separate suit in this Court under 42 U.S.C. § 1981 as provided by 28
16   U.S.C § 1343(a)(4).

17         10.    This court also has supplemental jurisdiction over Plaintiff's related state law claim under
18   28 U.S.C. § 1367. Plaintiff's state law claim arises from the same common nucleus of operative facts as
19   the underlying federal claims.

20         11.    This Court has personal jurisdiction over defendant Tesla and Does 1-10, because this
21   action arises out of Defendants' contacts with the state of California. Specifically, this Court has
22   personal jurisdiction over defendant Tesla because it is a corporation conducting business in the state of
23   California. In addition, Plaintiff is informed and believes, and thereupon alleges, that Tesla owns real
24   property within the state of California. Finally, a substantial portion of the acts giving rise to all
25   Defendants' liability occurred in the state of California.

26         12.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial part
27   of the events or omissions giving rise to the claim occurred at the Fremont factory, which is located in
28   this judicial district. Furthermore, venue is proper in this Court pursuant to 28 U.S.C. §1391(c), because

2

the principal place of business of Tesla is in Palo Alto, California, which is likewise located in this judicial district.

## FACTUAL ALLEGATIONS

13.     In 2012, Mr. Lambert traveled across the country—from Alabama to California—in search of gainful employment and a better future. Mr. Lambert had extensive training and education in the field of electrical engineering. He soon secured employment as an electrician.

14.     On February 11, 2015, Mr. Lambert applied for employment with Tesla. On June 23, 2015, Tesla e-mailed Mr. Lambert an eight-page, single-spaced employment offer letter ("offer letter"). A true and correct copy is attached hereto as Exhibit A.

15.     Buried in the offer letter, on its third page, was a so-called "arbitration provision," which purports to require the parties to arbitrate disputes arising between them, except for those "arising under the Proprietary Information and Inventions Agreement"—those most likely to be brought by Tesla.

16.     Apart from Tesla's logo on the front page and the words "Notice to Employee" on page six, there are no headings in the document. The offer letter seamlessly transitions between a paragraph regarding Tesla's confidentiality agreement into the supposed arbitration agreement.

17.     Mr. Lambert is informed and believes, and thereupon alleges, that the offer letter he received was a standardized contract, imposed and drafted by Tesla.

18.     On June 24, 2015, Mr. Lambert electronically signed the offer letter.

19.     Mr. Lambert began work as a Production Associate in Tesla, Inc.'s Fremont factory, on June 26, 2015.

20.     Mr. Lambert was a dedicated employee and eager to succeed. As a result, Mr. Lambert worked hard for Tesla and put in long hours on the production line.

21.     From approximately June 26, 2015 to April 2016, Mr. Lambert was assigned to "Chassis Two," where he worked with Supervisor Charles Lambert (no relation), Head Lead Christian Kramer, Lead Jose Jimenez, Production Associate Crispin Rodriguez, and Production Associate Treat Doan.

22.     During Mr. Lambert's time assigned to Chassis Two, the other employees consistently harassed him and interfered with his ability to perform his obligations of employment on the basis of his race and/or color.

23.     Almost immediately after Mr. Lambert began work on Chassis Two, Head Lead Kramer, Mr. Jimenez, Mr. Rodriguez, and Mr. Doan, interfered with Mr. Lambert's ability to work effectively and targeted Mr. Lambert for harassment on the basis of his race and/or color. This harassment included, but was not limited to: attaching VIN number stickers to Mr. Lambert's back; filling Mr. Lambert's back pockets with gold nuts and screws; sticking tools in Mr. Lambert's pocket; hiding Mr. Lambert's tools; using adhesive tape to stick Mr. Lambert's tools to a table; stealing Mr. Lambert's phone, and then using it to take photos and videos, without his permission. Mr. Lambert repeatedly pled with them to stop this conduct. Their behavior toward Mr. Lambert evinced a disregard for Mr. Lambert's personhood; by disregarding Mr. Lambert's consent and by treating Mr. Lambert as an object, Mr. Lambert's harassers emulated the subordinating treatment of African-American men all too common until the Civil Rights Movement.

24.     Approximately one or two months into Mr. Lambert's work on Chassis Two, the harassment and interference took on an explicitly racist tone. The Chassis Two employees, and in particular Mr. Kramer, Mr. Jimenez, Mr. Rodriguez, and Mr. Doan, called Mr. Lambert a "nigger" on a continuous basis. For example, they left a recording on his phone stating, "Nigger, we take your ass home, nigger. Shred you up in pieces, nigger. Cut you up, nigger. Send your ass [to] everyone in yo family so everybody can have a piece of you, nigger. Straight up, nigger. We get down like that, nigger."

25.     The Chassis Two employees routinely made racist and derogatory comparisons of Mr. Lambert to African-American fictional characters known for their servility and/or humiliation, including slaves. For example, one of the Chassis Two employee remarked on Mr. Lambert's appearance, "Don't this nigger look like Samuel Jackson." Samuel L. Jackson is a well-known African-American actor, recently notable for playing a servile "house slave" in the 2012 film "Django Unchained." At another time, a Chassis Two employee explicitly compared to Mr. Lambert to Jackson's character in the movie "Django Unchained": "Don't he look like this nigger [Samuel L. Jackson's character]? These two niggers are just alike." Another time, an employee remarked, "Don't this nigger [Mr. Lambert] look like Major Payne." Major Payne is a character in an eponymous 1995 film, about a Marine who returned from combat to find that he had, once again, received a promotion, and was then discharged. Payne is unable to even qualify as a police officer. As a result, Payne is relegated to teaching at a preparatory

PLAINTIFF LAMBERT'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

high school, where he was to instruct the Junior Reserve Officer Corps. Likewise, another employee described Mr. Lambert as "the black version of Mr. Clean." Mr. Clean is the white mascot of an eponymous all-purpose cleaner.

26.     The Chassis Two employees also invoked sexual stereotypes of African-Americans and sought to subordinate and sexually humiliate Mr. Lambert because of his race and/or color. In one instance, as Mr. Lambert was bent over working on the line, Head Lead Kramer stuck a drill gun into Mr. Lambert's buttocks. They also routinely made comments hypothesizing about the size of Mr. Lambert's penis, and insinuated that he was incapable of pleasing a sexual partner.

27.     Astonished to find such explicit racist conduct in the supposedly progressive Bay Area, Mr. Lambert repeatedly sought to put an end to the harassment. As early as Fall 2015, Mr. Lambert complained to Supervisor Charles Lambert about the hostile work environment. He also asked, "Why do they use the N-word so freely around here?" Supervisor Lambert's sole response was to instruct the Chassis Two employees to stop referring to Mr. Lambert as "nigger." Supervisor Lambert took no additional action, even when the Chassis Two employees continued to refer to Mr. Lambert as "nigger."

28.     When Mr. Lambert's complaints to Supervisor Lambert bore no fruit, he turned in desperation to Tesla's Human Resources Department. He complained about being referred to as a "nigger" in the work place, and also lodged complaints about some of the above-described harassment. He was told that the Human Resources Department would investigate the situation. However, the hostile work environment continued without abatement. There is no evidence that the Human Resources Department had conducted the promised investigation, or that any person had taken action to alleviate the harassment. Accordingly, the harassment continued.

29.     Realizing that Tesla might never take any action to help him, Mr. Lambert sought to help himself by applying to positions elsewhere in the company beginning in December 2015. However, none of them led to a transfer or any relief from the harassment.

30.     Mr. Lambert again complained to Tesla's Human Resources Department; this time he asked specifically for transfer to another line. Tesla again provided Mr. Lambert no relief. To the contrary, Tesla rewarded Mr. Lambert's harassers with promotions. In approximately February 2016, Head Lead Kramer was promoted to Supervisor of Chassis Two; Mr. Jimenez was promoted to Head

PLAINTIFF LAMBERT'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

1    Lead; both Mr. Rodriguez and Mr. Doan were promoted to Lead positions. At the same time, Supervisor

2    Lambert, who was the only other African-American on Chassis Two and who had asked the other

3    Chassis Two employees to stop referring to Mr. Lambert as "nigger," was transferred to another line.

4        31.    Directly as a result of Tesla's actions, Mr. Lambert was now fully at the mercy of his

5    harassers. Mr. Lambert's new supervisor, now-Supervisor Kramer, threated Mr. Lambert: "Your ass is

6    outta here now. Charles isn't here to protect you anymore." Mr. Lambert again complained to

7    Supervisor Lambert about the hostile environment and threats; the harassment continued still.

8        32.    Soon after Supervisor Kramer's promotion, he and the other Chassis Two employees

9    began to take steps to terminate Mr. Lambert from employment with Tesla on the basis of his race

10   and/or color. They attempted to provoke Mr. Lambert by intensifying the harassment. Mr. Lambert

11   responded by saying, "I'm not losing my job for one of you kids." In approximately February 2016, a

12   Lead from another line told Supervisor Kramer, "You trying to set that man up. That man has a family.

13   You don't do shit like that." Supervisor Kramer disregarded this admonition. Instead, he issued Mr.

14   Lambert a write-up for eating a snack bar on the line, though other employees routinely ate food on the

15   line. In fact, only a few days prior, donuts were passed around the line; no one was reprimanded in any

16   way for eating the donuts on the line. Mr. Lambert complained to Assistant Manager Alfonso Franco

17   about the harassment and retaliation; Mr. Franco stated, "You all need to get along."

18       33.    After enduring nearly one year of harassment, and of inaction by Tesla, Mr. Lambert was

19   finally transferred out of Chassis Two to Station 40 in April 2016. After the transfer, Mr. Lambert began

20   receiving fewer overtime hours and eventually was given no overtime hours. Mr. Lambert's harassers

21   also had not finished with him; they persisted in their efforts to terminate his employment.  In

22   approximately July 2016, one of the Chassis Two employees presented to the Human Resources

23   Department a photograph of Mr. Lambert taken inside the Fremont factory that Mr. Lambert had

24   uploaded to Facebook. Although employees were prohibited from posting such photographs, other

25   employees had engaged in identical conduct and never been reprimanded in any way. Nonetheless, the

26   Human Resources Department issued Mr. Lambert a "final written warning." Mr. Lambert attempted to

27   address the warning with the Human Resources Department in a meeting with Human Resources

28   Representative Rose Sanson. Mr. Lambert showed Sanson the hateful, violent, and racist videos created

1  by the Chassis Two employees, including Supervisor Kramer and Mr. Rodriguez, of their own harassing

2  behavior. Nonetheless, Tesla took no action, either to investigate or reprimand the harassers. Instead,

3  Tesla again rewarded one of the harassers by promoting Mr. Jimenez to supervisor.

4        34.    In addition to fostering this hostile work environment, Tesla discriminated against and

5  retaliated against Mr. Lambert on the basis of his race and/or color by refusing to promote Mr. Lambert

6  because of his race and/or color. Tesla claimed that it initially refused to promote Mr. Lambert because

7  Mr. Lambert had not met a supposed "six-month requirement period"; Tesla's justification is belied by

8  the fact that it promoted employees who were not African-American who did not meet the "six-month

9  requirement period"—among them was one of Mr. Lambert's harassers. Tesla later denied Mr. Lambert

10  a promotion again, on the basis of the above-mentioned retaliatory and racially motivated write-ups.

11        35.    Tesla also retaliated against Mr. Lambert by refusing to properly rotate him, thereby

12  causing serious injury to Mr. Lambert's back. Because Production Associates often engage in repetitive

13  work, Tesla's policies require that they rotate their Production Associates every two hours to avoid

14  injuries. Tesla failed to rotate Mr. Lambert in accordance with this policy. Mr. Lambert complained on

15  multiple occasions about Tesla's failure to rotate him, and about the resulting pain developing in his

16  lower back due to the repetitive motions required by his job. Mr. Lambert complained to the Human

17  Resources Department and to his supervisor. He told them, "tell them to rotate me," "you need to rotate

18  me," and "my back is killing me." Human Resources Representative Erin Garcia stated she would speak

19  to Supervisor Cole Buchner about this matter. However, Mr. Lambert continued to work at the same

20  station and was refused any alternative work. In fact, another employee by the name of Jared (last name

21  unknown) told Mr. Lambert that the last employee to perform Mr. Lambert's job incurred a back injury.

22        36.    Mr. Lambert therefore continued to work in a confined space for up 12 hours per day, six

23  days per week. This continued for three months, until Mr. Lambert suffered a lumbar back strain that

24  caused radiating pain starting from his lower back down to his upper buttocks, and resulted in a visit to

25  the emergency room. On July 29, 2016, the Tesla Health Center conducted a physical of Mr. Lambert

26  and issued work restrictions that limited lifting, pushing, and pulling up to a maximum of 10 pounds,

27  prohibited stooping and bending, and limited standing or sitting to a maximum of four hours per day.

28

PLAINTIFF LAMBERT'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL

37.     Despite these medical limitations, Supervisor John Maestre required Mr. Lambert to continue to work 12 hours per day, and to continue doing the same work that caused Mr. Lambert's back injury. Supervisor Maestre refused to take Mr. Lambert's injury or request for accommodations seriously, and told Mr. Lambert that if he could not do the work, he should go home.

38.     Mr. Lambert brought Supervisor Maestre a Work Status Recommendation from his health care provider, requiring that he preform mostly seated work and limit standing or walking to no more than 10 minutes per hour. Supervisor Maestre initially provided Mr. Lambert with a plastic crate with no back support as an "accommodation"; other employees, who had not complained about race harassment, had regular chairs that provided back support. When Mr. Lambert asked for a chair with back support he was told that his request would not be accommodated because it was not specified in the Work Status Recommendation. Mr. Lambert's health care provider therefore issued a new Work Status Recommendation limiting Mr. Lambert to "Mostly seated with *back support*. Limit standing to no more than 10 minutes/hour." This time, Supervisor Maestre refused to accommodate Mr. Lambert because, he claimed, no chairs were allowed on the line—despite the fact that other employees were using chairs on the line. Instead, Supervisor Maestre ordered Mr. Lambert to go home.

39.     Mr. Lambert complained to Human Resources Representative Elyse Elliot for being forced to go on leave when he was more than capable of performing the job with the assistance of a chair with back support. In response, Ms. Elliot instructed Mr. Lambert to go home, and notified him that the company would contact him when it had light duty available. Tesla placed Mr. Lambert on involuntary leave from September 1, 2016 until November 2, 2016, because it refused to accommodate his request for a chair with back support.

40.     After Mr. Lambert complained to the Human Resources Department, Tesla reacted by falsely accusing him of fighting with and threatening other workers, and of using profanity in the workplace. These claims were originally made by Mr. Lambert's harassers. Meanwhile, Tesla continued to ignore Mr. Lambert's previous requests that it investigate the race- and color-based harassment of its other employees. This appears to be part of a campaign to threaten, bully, and defame Mr. Lambert for attempting to exercise his rights and to silence him going forward.

41.     Consistent with its modus operandi, one day after Mr. Lambert filed his complaint in state court, Tesla placed Mr. Lambert on indefinite leave. Tesla stopped paying Mr. Lambert after it forced him to go on leave. Mr. Lambert made numerous complaints to Human Resources about this retaliatory behavior and Tesla finally reinstated only half of his pay while continuing to keep him on indefinite leave.

42.     As a result of the acts and omissions of all Defendants, Mr. Lambert has suffered, and continues to suffer, emotional distress and psychological damage including, but not limited to: depression, anxiety, stress, insomnia, loss of confidence and self-esteem, and uncertainty of his future. The Defendants' actions have also resulted in wage and benefits loss, and are expected to result in economic loss in the future.

43.     Mr. Lambert is informed and thereupon believes that managing agents, officers, and/or directors of Tesla ratified the wrongful conduct of its employees and managers by knowing of the conduct and failing to take immediate remedial action and by retaining and even promoting the employees responsible despite knowledge of the conduct.

44.     Mr. Lambert is informed and thereupon believes that Tesla has ignored, permitted, and/or ratified race- and/or color-based harassment by its employees in the workplace prior to the incidents described above.

45.     On the basis of these facts, Mr. Lambert filed a Complaint against Tesla on March 27, 2017, in the Superior Court of the State of California in the County of Alameda.

46.     That Complaint stated ten causes of action under California law: (1) race harassment in violation of the California Fair Employment and Housing Act ("FEHA"); (2) race discrimination in violation of the FEHA; (3) sexual harassment in violation of the FEHA; (4) retaliation in violation of the FEHA; (5) failure to prevent harassment, discrimination, and retaliation in violation of the FEHA; (6) threats of violence in violation of the California Ralph Act; (7) violation of the California Bane Act; (8) failure to accommodate in violation of the FEHA; (9) assault; and (10) battery.

47.     On May 22, 2017, Tesla filed a Motion to Compel Arbitration; Lambert opposed on the basis that Mr. Lambert was exempt from arbitration, that Mr. Lambert's stated causes of action were non-arbitrable, and that the putative arbitration clause was unconscionable.

48.     On July 19, the Honorable Sandra K. Bean granted Tesla's Motion to Compel Arbitration.

### FIRST CAUSE OF ACTION
### RACIAL DISCRIMINATION,
### HOSTILE WORK ENVIRONMENT,
### and RETALIATION
### 42 U.S.C. § 1981

49.     Mr. Lambert incorporates the factual allegations set forth in the preceding paragraphs by reference.

50.     Under 42 U.S.C. § 1981, it is unlawful to subject individuals to discrimination or harassment on the basis of their race and/or color in the formation and performance of contracts; this extends to the creation of a hostile work environment. Section 1981 similarly prohibits retaliation for making complaints arising from conduct it prohibits. An at-will employment relationship is a "contract" under the meaning of this statute.

51.     Defendant Tesla is, and at all times mentioned herein was, an "employer" within the meaning of this statutory provision. Defendant DOES 1-10 are, and at all times mentioned herein were, agents of defendant Tesla

52.     Plaintiff Mr. Lambert is, and at all relevant times mentioned herein was, a person of African-American descent, engaged in an at-will employment relationship with Defendants.

53.     Defendants have intentionally discriminated against Mr. Lambert in the making and execution of contracts on the basis of his race and/or color. Defendants subjected Mr. Lambert to race-based and/or color-based discriminatory and harassing behavior so severe and pervasive that it altered the terms and conditions of his employment. Among other behaviors, Defendants subjected Mr. Lambert to the constant use of racial slurs in the workplace both generally and directed specifically at Mr. Lambert. Defendants, and their agents, knew that Mr. Lambert's coworkers physically harassed Mr. Lambert, and interfered with Mr. Lambert's ability to execute his responsibilities, and other offensive, harassing, and unlawful behavior, all on the basis of his race and/or color. Moreover, Defendants were aware that their employees imposed badges and incidents of slavery upon Mr. Lambert by treating Mr. Lambert as an object, such as by applying VIN number stickers to his back.

Defendants failed to appropriately intervene to stop this unlawful behavior, and, worse, ratified that conduct.

54.     Mr. Lambert repeatedly sought to put an end to this behavior. Despite his efforts, Defendants took no action, and even rewarded and promoted those responsible for his harassment.

55.     Tesla refused to consider Mr. Lambert for promotion on the basis of his race and/or color, and selectively enforced policies on that same basis. As a result of Tesla's retaliation of Mr. Lambert for his complaints about harassment on the basis of his race and/or color, Mr. Lambert's wages decreased due to Tesla's refusal to provide him with any overtime, and he sustained a back injury. Tesla then refused to reasonably accommodate Mr. Lambert, also as a result of his objection to a hostile work environment. Immediately after Mr. Lambert filed his complaint in state court alleging discriminatory and retaliatory conduct by Tesla, the company further retaliated against Mr. Lambert by placing him on indefinite leave and decreasing his pay.

56.     The unequal treatment to which Mr. Lambert has been subjected to on the basis of his race and/or color is so severe and pervasive that it changed the terms and conditions of his employment.

57.     The above conduct by Mr. Lambert's co-workers and supervisors was unwelcome, directed towards him, and part of a continuing pattern of conduct. Mr. Lambert considered the conduct of Tesla's employees to be of an expressly racially hostile nature, and believed this conduct was directed at him because he is African-American.

58.     As a result, the conduct was offensive and oppressive, and changed the terms and conditions of Plaintiff's employment by subjecting them to a racially hostile atmosphere. Mr. Lambert repeatedly attempted to protest and resist this behavior. Rather than addressing the unlawful behavior of its employees, however, Tesla retaliated against Mr. Lambert by refusing to promote him, through noncompliance with its own rotation policy, resulting in injury to Mr. Lambert, and by refusing to provide a reasonable accommodation for the disability Mr. Lambert sustained as a result of Tesla's refusal to comply with its own rotation policy.

59.     Mr. Lambert at no time encouraged the hostile behavior complained of herein, or indicated in any way to any employee of Tesla that this behavior was welcome.

60.     The conduct of Tesla employees towards Mr. Lambert, coupled with Tesla's lack of response, caused Mr. Lambert to reasonably perceive his work environment as hostile, intimidating, abusive, and offensive; a reasonable African-American individual in Mr. Lambert's position would have come to the same conclusion.

61.     Mr. Lambert complained to multiple supervisory employees of Tesla as well as to the Human Resources Department about the racially hostile work atmosphere and subsequent retaliation. Tesla had actual and/or constructive knowledge of the actions committed by the Chassis Two employees and others. However, the harassment continued long after Tesla received information regarding the harassment. Tesla retained and promoted Mr. Kramer, Mr. Jimenez, Mr. Rodriguez, and Mr. Doan, and retained all other employees responsible for the harassment, thereby ratifying their conduct.

62.     The above-described discrimination, harassing conduct, and retaliation violates the Civil Rights Act of 1866 (42 U.S.C. § 1981), and entitles Mr. Lambert to all categories of damages, including (but not limited to) economic, non-economic, exemplary, and punitive damages.

63.     As a direct and consequential result of Tesla's actions and omissions, Mr. Lambert has suffered and continue to suffer special damages.

64.     As a direct and consequential result of the actions and failures to act by Tesla alleged herein, Plaintiff has suffered injury to their mental and emotional well-being, including fear, anxiety, depression, pain, humiliation, anger, despair, embarrassment, and uncertainty; all of the type, nature, and extent ordinarily associated with the wrongful conduct alleged against Tesla herein. The value of Plaintiff's damages for injuries to his mental and emotional well-being is an amount in excess of the minimum jurisdictional threshold of this Court, the precise amount of which will be proven at trial.

65.     Because the above-described words and actions, among others, were spoken, carried out, or ratified by Tesla and because said Defendants or their agents acted in a deliberate, malicious, cold, callous, deceptive, oppressive, and intentional manner in order to injure and damage Mr. Lambert and with cold and callous disregard for Mr. Lambert's rights, Mr. Lambert requests the assessment of punitive damages against Tesla in an amount deemed proper by this Court.

66.     As a result of the harassing and discriminatory conduct, Mr. Lambert had to retain attorneys to prosecute this action. Mr. Lambert is therefore entitled to reasonable attorney's fees and litigation expenses, including expert witness fees and costs, incurred in bringing this action.

**SECOND CAUSE OF ACTION**
**DECLARATORY JUDGMENT OF**
**NON-ARBITRABILITY**
**28 U.S.C. §§ 2201-2202**

67.     Mr. Lambert incorporates the factual allegations set forth in the preceding paragraphs by reference.

68.     An actual controversy has arisen and now exists relating to the rights and duties of the parties herein concerning Mr. Lambert's ability to vindicate his rights in a court of law. In a parallel state action, Tesla has, under similar facts, contended that the putative arbitration agreement encompasses all civil rights claims brought by Mr. Lambert.

69.     Congress enacted 28 U.S.C. § 1981 as part of the Civil Rights Act of 1866; this was 59 years before Congress passed the Federal Arbitration Act, which enforces arbitration provisions of contracts.

70.     In enacting Section 1981, Congress was specifically concerned about providing to aggrieved individuals access to the federal court system and ensuring that contracts did not have the effect of depriving them of their right to have their day in court. Congress specifically included a provision in the Civil Rights Act of 1866 to allow Section 1981 cases to be brought in federal court, a rarity at that time. In debate over that provision, Senator John Sherman explained: "To say that a man is a freeman and yet is not able to assert and maintain his right *in a court of justice* is a negation of terms" Cong. Globe, 1st Sess. 41 (1866) (emphasis added).

71.     Moreover, the Civil Rights Act of 1866 was passed against a background in which Southern whites sought to re-subjugate the newly-freed slaves through one-sided contracts and the enactment by state legislatures of Black Codes. Among other abrogations of rights, these Codes denied full access to the court system to African-Americans and enhanced the control of white employers over African-American employees.

72.     The enforcement provisions of the Civil Rights Act of 1866 were notable for "their dependence on judicial enforcement to the nearly complete exclusion of alternatives." George Rutherglen, CIVIL RIGHTS IN THE SHADOW OF SLAVERY: THE CONSTITUTION, COMMON LAW, AND THE CIVIL RIGHTS ACT OF 1866 57 (2013). These provisions "augmented the power and personnel of the federal judiciary . . . . The Supreme Court was given appellate jurisdiction over all cases raising legal issues under the act." *Id*. at 59-60. Congress undeniably intended to allow claims under Section 1981 to be brought in federal court without interference; clearly, it believed that litigation of these matters in federal courts was the superior and preferable method. *See id*. at 60.

73.     Given these facts, it would be in direct contradiction to the legislative history, purpose, and intent of Section 1981 to compel such claims to be arbitrated.

74.     On this basis, Mr. Lambert seeks declaratory judgment from this Court that the cause of action brought under Section 1981 is not arbitrable.

WHEREFORE, Mr. Lambert prays judgement against Tesla. as fully set forth below.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against Tesla as follows:

1.     A declaration by this Court that Mr. Lambert's claim brought under 42 U.S.C. § 1981 is not arbitrable;

2.     General damages according to proof, however, no less than the jurisdictional limit of this court;

3.     Special damages in amounts according to proof, together with prejudgment interest;

4.     Exemplary and punitive damages in amounts according to proof pursuant to 42 U.S.C. § 1981a;

5.     Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, and any other applicable statute;

6.     Interest as provided by law;

7.     Costs of suit incurred herein;

8.     Injunctive relief to require Tesla, Inc., to better train its staff on race- and color-based harassment, discrimination, and retaliation; and

9.      For such other and further relief to which Mr. Lambert may be entitled as a matter of law or equity, or as the Court deems just and proper.

Dated: September 15, 2017                    **CALIFORNIA CIVIL RIGHTS LAW GROUP**

By: _____
       Lawrence A. Organ (SBN 175503)
       Navruz Avloni (SBN 279556)
       Attorneys for Plaintiff
       DeWitt Lambert

### DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial on all issues.

Dated: September 15, 2017                    **CALIFORNIA CIVIL RIGHTS LAW GROUP**

By: _____
       Lawrence A. Organ (SBN 175503)
       Navruz Avloni (SBN 279556)
       Attorneys for Plaintiff
       DeWitt Lambert

PLAINTIFF LAMBERT'S COMPLAINT FOR DAMAGES AND DEMAND FOR JURY TRIAL